ALBERT NORMAN COLLINS and VERA JENSEN COLLINS, Plaintiffs-Appellees, *v.* JERRY AUGUST GOETSCH and JEAN ANN GOETSCH, Defendants-Appellants.

NO. 6231

AUGUST 23, 1978

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR and KIDWELL, JJ.

OPINION OF THE COURT BY OGATA, J.

This is an appeal from the issuance of a permanent injunction prohibiting defendants-appellants Jerry August Goetsch and Jean Ann Goetsch (hereinafter appellants) from advertising, renting, selling or otherwise using their property for occupancy other than as a single-family dwelling. The dispute in this case centers around the meaning of certain restrictive covenants to which appellants' property is subject. For reasons set forth below, we reverse.

Several findings of fact were made by the court below. These factual findings will be set out for the most part here.

Plaintiffs-appellees Albert Norman Collins and Vera Jensen Collins (hereinafter appellees) were the subdividers and developers of a tract of land known as the "Golden Shores Subdivision" located in Waialua, Oahu, Hawaii. All but two of the lots in the said subdivision were conveyed to various purchasers by appellees, and the conveyances were made subject to certain "Restrictive Covenants and Conditions". There is no dispute that these covenants run with the land and are currently binding upon appellants.

Appellants are the record owners of Lot 611B of the Golden Shores Subdivision. Lot 611B is 7,500 square feet in area and is a portion of a lot originally conveyed by appellees to, and then subdivided by, the original grantees. The original grantees sold Lot 611B to appellants on or about April 3, 1974, pursuant to an agreement of sale. A deed completing this sale

was executed on July 7, 1975. The designated zoning for Lot 611B is "R-6", which allows duplex dwellings on parcels having a minimum area of 7,500 square feet.

Pursuant to the requirements of Paragraphs 5 and 6 of the Restrictive Covenants and Conditions, appellants submitted to appellees plans for a single-family dwelling which appellants proposed to construct on Lot 611B. Appellees approved the plans by a letter dated August 30, 1974.

On or about March 12, 1975, appellants advertised the lot for sale as "zoned for duplex". Appellees noticed the advertisement in the newspaper and immediately informed appellants by letter that the provisions of the Restrictive Covenants and Conditions required approval of plans from appellees before construction could commence and that appellees would not approve construction of any duplexes in the subdivision. Appellants nevertheless proceeded with construction of a structure on Lot 611B in late May or early June, 1975.

Appellees thereafter contacted the Building Department of the City and County of Honolulu to ascertain whether the plans which appellants had submitted with their application for a building permit were the same as those which appellees had previously approved. Appellees determined that the plans were in fact the same.

Appellees subsequently personally inspected the completed structure in October, 1975, and reported to the City Building Department that the structure had not been constructed according to the plans submitted and that the structure had been constructed as a two-family dwelling. An inspection of the completed structure was made by the Building Department on October 28, 1975, and a citation was issued to appellants for construction of a structure other than that for which a building permit had been issued. As a result, appellants applied for and were issued a new building permit on the basis of modified plans showing a duplex structure.

Paragraph 1 of the Restrictive Covenants and Conditions specifies in pertinent part that "Said lot shall contain no more than one single-family dwelling, except, where a second living unit is legally permitted, any such second unit shall be a part of and annexed to the main dwelling, and maintain an

outward appearance of a single-family dwelling rather than of a duplex.''

Appellees commenced this action to enforce the above restrictive covenant and to require modification of the structure on Lot 611B so as to restore it to the interior configuration of a single-family dwelling in accordance with the plans originally approved by them. A temporary restraining order prohibiting appellants from conveying title to the subject property was issued by the court below on November 20, 1975. After two subsequent hearings, the court issued its findings of fact and conclusions of law on February 4, 1976, and a judgment in the nature of a permanent injunction was also entered on that date.

The central issue in this case is whether Paragraph 1 of the Restrictive Covenants and Conditions prohibits the construction and use of a duplex on Lot 611B. While we conclude that the findings of fact made by the court below are not clearly erroneous, HRCP Rule 52(a), we find that certain conclusions of law which were reached by that court cannot be supported under the record presented.[1] Hence, in view of our determination that the permanent injunction was based

---

[1] The court below reached the following conclusions of law:

1. The Restrictive Covenants and Conditions provide that "Said lot shall contain no more than one single family dwelling . . ." which requires that a building constructed on any lot in the subdivision be a dwelling for a single family.

2. The restrictive covenants permit the construction of a second living unit in the nature of servants quarters, guest quarters, or quarters for occupancy by relatives of the family which occupies the main dwelling, but do not permit the use on any lot in the subdivision of a dwelling designed for occupancy by two or more families.

3. Plaintiffs are entitled to a judgment against defendants permanently enjoining defendants, their agents, employees, assigns and attorneys and all other persons in active concert and participation with them, from advertising, renting or selling the building situated on Lot 611B of the "Golden Shores Subdivision" for occupancy other than as a single family dwelling.

The judgment (permanent injunction) entered by the court below essentially followed the prohibitory language of Paragraph 3 above, but with the additional restriction against appellants "otherwise using" the property for occupancy as other than a single family dwelling.

We are in agreement only with conclusion of law No. 1 above. We find that conclusions No. 2 and No. 3 are not supported by substantial evidence and thus cannot be upheld. *See Dickstein v. Williams,* ___ Nev. ___, 571 P.2d 1169 (1977).

upon these erroneous conclusions of law, the judgment entered by the court below must be reversed.

The prevailing rule is that restrictive covenants are to be liberally construed in favor of the grantee and against the grantor, and substantial doubt or ambiguity is to be resolved in favor of the free and unrestricted use of property.[2] *In re Taxes of Johnson,* 44 Haw. 519, 538, 356 P.2d 1028, 1038 (1960). *See also Chang v. Magbee,* 45 Haw. 454, 455, 370 P.2d 479, 480 (1962). Although in some instances restrictive covenants may increase the value of property, "they do nonetheless raise title problems and impair alienability." *Berger v. State,* 71 N.J. 206, 215, 364 A.2d 993, 997 (1976). Therefore, restrictive covenants are to be strictly construed against the grantor because "[t]he limitations and prohibitions they impose may be felt over a very long period of time", and "[i]t is not too much to insist that they be carefully drafted to state exactly what is intended — no more and no less." *Id.* In thus attempting to construe ambiguous covenants, a court must look to the expressed intention of the parties as may be ascertained from the entire language of the covenant agreement. *Becker v. Arnfeld,* 171 Colo. 256, 259, 466 P.2d 479, 480 (1970) (en banc).

Paragraph 1 of the Restrictive Covenants and Conditions unambiguously provides in part that "Said lot shall contain no more than one single-family dwelling, . . . ." This provision ordinarily would have prohibited appellees from building more than one residential structure on the lot and from using that structure to house more than one family. *Easterly v. Hall,* 256 S.C. 336, 345, 182 S.E.2d 671, 675 (1971) (duplex); *Hayes v. Marshall,* 501 S.W.2d 269, 272 (Ky.App. 1973) (apartment building); *cf. Freeman v. Gee,* 18 Utah 2d 339, 423 P.2d 155 (1967) (covenant specified that only "one detached single family dwelling" permitted); *Rodgerson v. Davis,* 27 N.C.App. 173, 218 S.E.2d 471, *discretionary review denied,*

---

[2] Of course, such "free and unrestricted use of property" is favored only to the extent of applicable State land use and County zoning regulations. *Cf. Swaggerty v. Petersen,* 280 Or. 739, 743, 572 P.2d 1309, 1313 (1977).

228 N.C. 731, 220 S.E.2d 351 (1975) (more than "one single unit family residence" prohibited); *Cash v. Catholic Diocese,* 414 S.W.2d 346 (Mo.App. 1967) (lots to be used for "detached single-family dwellings only"). Had the covenant in Paragraph 1 contained only this specification, it would have been easy to decide this case in appellees' favor under the facts presented here.

However, the restriction in Paragraph 1 contains a vital exception clause. After first prohibiting construction of "more than one single-family dwelling" on the lot, the covenant goes on to provide: "*except,* where a *second living unit* is legally permitted, any such second unit shall be a part of and annexed to the *main dwelling,* and maintain an outward appearance of a single-family dwelling rather than of a duplex" (emphasis added). We agree with the court below that this portion of the covenant is ambiguous and was poorly drafted.

Appellees concede that the covenant is in fact ambiguous because the term "second living unit" is not defined in the Restrictive Covenants and Conditions and is not a term in common usage. However, appellees attempt to show that the covenant should nevertheless be construed in their favor, for they argue that an examination of the Restrictive Covenants and Conditions as a whole sufficiently reveals an intent that no duplexes are to be allowed in the Golden Shores Subdivision.

Appellees assert that it would seem incongruous for the drafters of the covenant to have first restricted use of the lots to single family dwellings and then to have immediately thereafter provided that the lots could, under limited conditions, be utilized for multi-family dwellings. They thus argue that the drafters of the covenant could not have intended to permit in the same breath what had just been prohibited. Appellees also contend that the term "second living unit" was in no way meant to be synonymous with the term "single-family dwelling". The former, it is argued, was meant to apply to servants' or guests' quarters and not to a living unit for an entirely separate family. This construction is mandated, appellees argue, because the covenant provides that any such second living unit is to be "a part of and annexed to"

the main dwelling, and the term "second living unit" thus implies a living unit which is subordinate in purpose to that of the "main dwelling".

We are unable to conclude that the court below was correct in agreeing with appellees' suggestion that Paragraph 1 of the Restrictive Covenants and Conditions permits the construction of a second living unit "in the nature of servants quarters, guest quarters, or quarters for occupancy by relatives of the family which occupies the main dwelling, but do not permit the use of any dwelling for occupancy by two or more families."

In the determination of the meaning of language used in restrictive covenants, the controlling factor is expressed intent, and unexpressed intent is generally "unavailing." *See Pulver v. Mascolo*, 155 Conn. 644, 649, 237 A.2d 97, 99 (1967).[3] We are unable to discern from the language of the restrictive covenants the intent to prohibit the construction and use of a duplex on appellants' lot. Nowhere in the covenants is there any specific indication that the term "second living unit" is intended to be subordinate in purpose to that of the "main dwelling", such that a separate family cannot be accommodated in the second living unit. The word "main", as used in the term "main dwelling", in fact suggests that more than one independent dwelling was contemplated. *See MacDonald v. Painter*, 441 S.W.2d 179, 183-84 (Tex. 1969). The only restrictions explicitly stated in Paragraph 1 are that any second

---

[3] In so determining the meaning of the language used in a restrictive covenant, a court will take account of the language utilized in the instrument as a whole, *Becker v. Arnfeld, supra*, 171 Colo. at 259, 466 P.2d at 480, and will first look to the plain, ordinary and popular meaning of the words used in the covenant. *See King v. Kugler*, 197 Cal.App.2d 651, 655, 17 Cal.Rptr. 504, 506 (1961). Additionally, where it may be of assistance, a court may consider the general plan and appearance of existing structures established in the tract in order to ascertain the proper meaning to be accorded the covenant. *Id.*

In the instant case, there is, of course, no common and popular meaning attributable to the phrase "second living unit". Furthermore, no evidence appears in the record to show that appellants' structure differs in plan and appearance from any substantial number of other structures in the subdivision. Therefore, we are forced to construe the covenant here solely on the basis of the language employed within the covenants as a whole.

living unit must be made a part of and annexed to the main dwelling and that the physical appearance of the structure must be that of a single family dwelling rather than of a duplex.

We recognize that initially it appears odd for the drafters of the covenant to have first set out a single-family dwelling restriction and then to have seemingly nullified that restriction by adding the exception clause. However, the exception clause itself is oddly drafted and presents serious problems in ascertaining the meaning which should be attributed to it. We are, in any event, guided by the rule that restrictive covenants are to be strictly construed. *In re Taxes of Johnson, supra. See also Chang v. Magbee, supra.*

In so construing the restrictive covenants as a whole, we are satisfied that although the specific covenant now before us initially reveals an expressed preference for single-family dwellings, the exception clause validly relaxes this preference to the extent that the applicable zoning laws allow duplexes to be built in the subdivision. Thus, in the event that the zoning for the subdivision area is changed so as to preclude the construction of multiple-family dwellings, the exception clause would become null and void. In the meantime, however, the clause serves to allow duplexes to be built in the subdivision, with the proviso that such duplex structures must maintain the outward appearance of single-family dwellings. We believe that this interpretation comports with the apparent preference of the developers and present owners of the subdivision for a neighborhood composed of structures which outwardly appear to be single-family residences.

We hasten to point out that if the drafters of the covenant had intended that no duplexes were to be built in the subdivision, they could easily have so provided in the covenant. *See Houk v. Ross,* 34 Ohio St.2d 77, 91, 296 N.E.2d 266, 275 (1973). *See also* the covenants employed in *Feely v. Birenbaum,* 554 S.W.2d 432 (Mo.App. 1977) (use of any residential structure "by more than one family" prohibited), and *Kent v. Smith,* 410 S.W.2d 833 (Tex.Civ.App. 1967) (lot use restricted to "residential purposes"; "residential purposes" defined in covenants so as to explicitly exclude duplexes). The omission

of such an explicit provision in the covenant in Paragraph 1 causes us to doubt that the drafters of the covenant intended to prohibit once and for all the construction and use of duplexes in the subdivision.

As indicated, we construe the primary purpose of the exception clause to be the regulation of the exterior appearance of the residential structures in the subdivision which contain more than one "living unit." Moreover, a strict reading of the exception clause reveals that the restriction on structural appearance is not specifically directed at regulating the interior use of any such structure. A restriction on exterior structural characteristics and a restriction on internal use of a structure are wholly independent of each other, and "the one is not to be extended so as to include the other unless the intention to do so is expressly and plainly stated . . . ." *Schulman v. Serrill*, 432 Pa. 206, 211, 246 A.2d 643, 646 (1968).

There is no dispute that the structure on Lot 611B is a single structure containing two living units, each of which is inaccessible from the other, and that the outward appearance of the structure is that of a single-family dwelling rather than of a duplex. The exterior appearance of the structure, which has two front entrances and two rear entrances, is the same as that shown on the original plans approved by appellees.[4] The outward appearance of appellants' structure thus complies in full with the structural restrictions set out in the exception clause of Paragraph 1. There being no comparable use restrictions set out in the exception clause, we find that appellants are entitled to use the structure as a duplex.

Finally, appellees may not claim that appellants were fully and adequately informed of the intended meaning of the restrictive covenants by virtue of appellees' March, 1975, letter stating that appellees would not approve the construction of duplexes in the subdivision. That letter was sent to

---

[4] Appellee Albert Collins' testimony indicated that as far as he was concerned, it was immaterial how many entries the structure had, so long as it was used as a single-family dwelling.

appellees nearly 13 months after the sale of Lot 611B had been entered into between the original grantees of Lot 611 and appellees.

We have already stated that, under a strict reading, the Restrictive Covenants and Conditions do not reveal any intent to prohibit the construction and use of duplexes on appellants' lot. The "critical time" for determining whether there was a sufficient understanding of the covenants on the part of the purchasers with regard to the meaning intended by the original grantors is the time of purchase. Otherwise, there would be nothing to prevent the original grantors from subsequently altering or diminishing the purchasers' ownership rights in the land. *See Weber v. Les Petite Academies*, 548 S.W.2d 847, 853 (Mo.App. 1976).

Here, appellees failed to make clear in the restrictive covenants their intended purpose with regard to the language employed in Paragraph 1. There is no evidence in the record that appellants were informed either prior to or at the time of sale of appellees' desire to exclude duplexes or other multifamily dwellings in the Golden Shores Subdivision. Appellees are now bound by their failure to adequately set out in the Restrictive Covenants and Conditions their desired restriction against multi-family dwellings. Such an explicit prohibition was particularly necessary where the existing zoning for the subject property permitted the construction and use of duplexes.

The judgment entered on February 4, 1976, permanently enjoining and restraining appellees from advertising, renting, selling or otherwise using the subject premises for occupancy other than as a single-family dwelling, is hereby vacated, with direction to the court below to dismiss the complaint.

*Anne L. Williams (James M. Sattler* of counsel) for Defendants-Appellants.

*Albert W. Evensen (Kai, Dodge & Evensen* of counsel) for Plaintiffs-Appellees.